FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2003 OCT 21  P 12: 47

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **CORDELL MARTIN** ) | |
| P.O. Box 524 ) | |
| Clarksville, MD 21029 ) | |
| ) | Civil Action No. _____ |
| **CAROLINE C. ANDREWS** ) | |
| 500 South Fayette Street ) | |
| Alexandria, VA 22314 ) | |
| ) | |
| **GARY M. BENNETT** ) | |
| 21143 Hawthorne Blvd., #178 ) | |
| Torrance, CA 90503 ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| **CLEANNET U.S.A., INC.** ) | |
| 9861 Brokenland Parkway, Suite 208 ) | |
| Columbia, MD 21046 ) | |
| ) | |
| **CLEANNET of** ) | |
| **BALTIMORE/WASHINGTON, INC.** ) | |
| 9861 Brokenland Parkway, Suite 208 ) | |
| Columbia, MD 21046 ) | |
| ) | |
| **MOHAMMAD F. SALEK** ) | |
| (a.k.a. "Mark F. Salek") ) | |
| 9948 Potomac Manors Dr. ) | |
| Potomac, MD 20854 ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

1.  This is an action under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Equal Pay Act of 1963, and Section 1981 of the Civil Rights Act of 1866 ("Section 1981") to remedy the Defendants' unlawful employment practices, and to compensate the Plaintiffs for losses incurred as a result of those practices.

## JURISDICTION

2. This is a civil action arising under Title VII, 42 U.S.C. § 2000e *et seq.*, the Equal Pay Act, 29 U.S.C. § 206 *et seq.*, and Section 1981, 42 U.S.C. § 1981 *et seq.* The Court therefore has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

## VENUE

3. Venue in this Court is proper, pursuant to 28 U.S.C. § 1391(b), because the Defendants reside in the District of Maryland. Moreover, a substantial part of the events and omissions giving rise to this action occurred within the District of Maryland.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4. The Plaintiffs have exhausted their administrative remedies by timely filing charges with the Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission on Human Relations ("MCHR"). The EEOC issued Notices of Right to Sue to Plaintiffs Cordell Martin, Caroline C. Andrews, and Gary M. Bennett dated July 22, 2003, which the Plaintiffs received on or about July 24, 2003. Plaintiffs Bennett and Andrews filed additional charges with the EEOC and MCHR on July 23 and 24, 2003 respectively. In connection with those charges, the EEOC issued Plaintiff Andrews a Notice of Right to Sue dated August 14, 2003, which she received on or about August 16, 2003, and issued Plaintiff Bennett a Notice of Right to Sue dated August 12, 2003, which he received on or about August 14, 2003.

## PARTIES

5. Plaintiff Cordell Martin ("Martin") has resided in Howard County in the state of Maryland at all times pertinent to this Complaint. Martin was formerly employed by Defendant CleanNet of Baltimore/Washington, Inc. ("CleanNet Baltimore/Washington").

6. Plaintiff Caroline C. Andrews ("Andrews") has resided in the Commonwealth of Virginia at all times pertinent to this Complaint. Andrews was formerly employed by Defendant CleanNet USA, Inc. ("CleanNet").

7. Plaintiff Gary M. Bennett ("Bennett") resided in the state of Maryland until February of 2003. Since that time, Bennett has resided in the state of California. Bennett was formerly employed by Defendant CleanNet.

8. Defendants CleanNet and CleanNet Baltimore/Washington are domestic Maryland corporations headquartered at 9861 Broken Land Parkway, Suite 208, Columbia, Maryland 21046, which is in Howard County. They are closely held corporations which are solely owned by Defendant Mohammad F. Salek.

9. Defendant Mohammed F. Salek (a.k.a. "Mark F. Salek") ("Salek") is the founder, CEO, President, and sole owner of CleanNet and CleanNet Baltimore/Washington. Salek is a resident of Montgomery County in the state of Maryland.

## JOINDER

10. Joinder of the Plaintiffs and their claims in this action is appropriate under Federal Rules of Civil Procedure 18 and 20 because these claims arise out of the same series of transactions or occurrences, and involve common questions of law or fact.

## FACTS

11. Defendants CleanNet and CleanNet Baltimore/Washington are Maryland corporations engaged in the commercial cleaning franchise business. Specifically, they are in the business of selling franchises that provide cleaning services for commercial clients.

12. On information and belief, Defendants CleanNet and CleanNet Baltimore/Washington are personally controlled and dominated by Salek without regard for required corporate formalities.

13. On information and belief, Salek improperly commingles the funds of CleanNet and CleanNet Baltimore/Washington and his personal accounts.

14. Bennett, a Caucasian male, began his employment at CleanNet in April of 2001 as a Regional Vice President.

15. Andrews, a Caucasian female, began her employment at CleanNet in December of 2001 as a Regional Vice President.

16. Andrews was hired to serve as Bennett's counterpart and to perform the same job functions. Their jobs required substantially equal skills, effort, and responsibilities. Moreover, these jobs were performed under similar working conditions.

17. For example, Andrews and Bennett were both in charge of ensuring that each of CleanNet's offices operated in accordance with guidelines established at CleanNet's corporate headquarters. Andrews and Bennett were both responsible for hiring Regional Directors for CleanNet's offices in Baltimore/Washington, Pittsburgh, Detroit, Chicago, Los Angeles, and Ft. Lauderdale. Andrews and Bennett also trained the Regional Directors to sell CleanNet franchises and to oversee the hiring and training of employees in contract sales, quality control, and telemarketing in each of CleanNet's offices. Andrews and Bennett shared management responsibility for all of CleanNet's offices; employees in these offices reported to both of them.

18. Salek, the President and sole owner of CleanNet and CleanNet Baltimore/Washington, had indicated that he did not want to hire a woman for this position because he did not believe that a woman would be able to do the job.

19. Throughout Andrews's tenure at CleanNet, Salek paid her a compensation package that was substantially lower than the compensation being provided to Bennett.

20. Namely, Andrews's base salary and commission plan at CleanNet were approximately half the salary and commission being paid to Bennett.

21. In 2002, CleanNet's new sales totaled more than $20 million. Even though both Andrews and Bennett played critical roles in achieving this success, Bennett received a $50,000 raise and $30,000 in bonuses, whereas Andrews was not given a raise at all.

22. Although Bennett repeatedly advised Salek to increase Andrews's compensation in order to make it commensurate with her job duties and performance, Salek refused.

23. Martin, an African American male, began his employment at CleanNet Baltimore/Washington in June of 2002. His job title was Sales Manager.

24. Salek had not wanted to hire Martin because of his race, but relented after Andrews and Bennett argued that Martin was the best qualified individual for the position.

25. Martin was hired to run the company's operations in the Baltimore/Washington D.C./Virginia markets. His job duties and responsibilities included hiring, quality control, working with franchisees, overseeing sales in the Baltimore/Washington D.C./Virginia markets, and other business development relating to these areas.

26. When Bennett advised Salek that giving Martin the job title of Regional Director would be more consistent with his actual job position and functions, Salek protested, "But he's Black," and refused to allow it.

27. Caucasian employees with the same job duties and responsibilities as Martin received different job titles and more lucrative compensation. For example, the individuals who served as the head of quality control and sales for the suburban Maryland/Baltimore, Washington, D.C., and Northern Virginia markets - both before and after Martin worked at CleanNet Baltimore/Washington - were given the job title of Regional Director and paid bigger

compensation packages, including higher commission levels and opportunities to earn additional income through commissions on franchise sales.

28. In September of 2002, Martin identified a need for new employees in sales, quality control, and telemarketing.

29. Accordingly, Martin advertised the positions and then reviewed resumes with Andrews and Salek. They agreed to hire four individuals based on their qualifications and the company's needs. At the time, Salek was particularly complimentary of these individuals' resumes and backgrounds.

30. The four new hires were African American.

31. When the new hires arrived at the company on their start date, which was on or about late September of 2002, Salek saw them in person for the first time.

32. That day, Salek asked Andrews if she had seen them, and then informed her that he wanted the new hires to be fired. He proposed that their resumes be re-reviewed, even though he had already reviewed them on at least three prior occasions and as recently as a few days earlier.

33. At the time, Salek made a comment to the effect of, "It's getting too dark around here. I want them out."

34. Andrews informed Martin about Salek's instructions, and Martin stated that he would not participate in firing the new hires because the terminations were racially motivated.

35. During a meeting with Salek at or around this time, Martin voiced his opposition to Salek's proposed racially discriminatory terminations relating to the new hires, and also expressed his concerns about not being compensated at the same level as other employees who had previously held the same job position.

36. Salek directed that Martin be discharged as an employee of CleanNet Baltimore/Washington that same day.

37. Salek, in concert with others, created a hostile work environment at CleanNet and CleanNet Baltimore/Washington through his dominating role as the sole owner and chief executive of the companies.

38. Salek instructed receptionists and employees in the human resources department at CleanNet not to transfer telephone calls to him if it sounded like the caller was an African American.

39. Salek frequently referred to African Americans as "those people" or "those kinds of people."

40. Salek directed Martin to intimidate the sales employees physically "so that they're afraid not to sell."

41. At a dinner for the CleanNet annual company meeting in February of 2003, Salek cautioned the Regional Directors against hiring African Americans, and generally characterized African Americans as lazy.

42. Salek encouraged another Regional Director for CleanNet Baltimore/Washington to hire more Caucasian employees, rather than African Americans.

43. In February of 2003, Salek acted in an outrageously abusive manner toward the contact for one of CleanNet's customers, David Weinstein. While in the office and in the presence of Bennett, Andrews, and other employees, Salek yelled at Weinstein over the telephone, threatened him, and repeatedly called him a "fucking Jew."

44. On the same day, Salek physically pushed a female employee out of his way while walking in the hallway of the office.

45. Bennett and Andrews advised Salek that they could not continue being forced to condone Salek's discriminatory and abusive behavior.

46. Salek told Bennett and Andrews that CleanNet was his company, and that they had to "do things my way or hit the highway."

47. Salek's harassing and discriminatory practices created such a hostile work environment that a reasonable person would have been compelled to resign under the circumstances.

48. Salek was aware that the work environment at CleanNet had become intolerable for its employees; yet, he chose to do nothing to remedy the situation.

49. The aggravating circumstances associated with the hostile work environment that existed at CleanNet caused Andrews and Bennett to resign from their positions at the company.

50. After their employment at CleanNet had ended, Andrews and Bennett began their own commercial cleaning company, Commercial Cleaning Services, LLC ("CCS"). CCS provides janitorial services in southern California and southern Virginia for commercial accounts.

51. On or about April 1, 2003, Martin, Andrews, and Bennett filed charges of employment discrimination at the EEOC against CleanNet in connection with the events relating to Martin, the unequal compensation being paid to Andrews, and the hostile work environment at CleanNet.

52. CleanNet and CleanNet Baltimore/Washington subsequently filed a lawsuit in Maryland state court against Andrews and Bennett in June of 2003, asserting common law claims for misappropriation of trade secrets, breach of contract, and copyright infringement arising out of their business dealings with CCS.

53. On information and belief, the Defendants' motive for filing the lawsuit was to retaliate against Andrews and Bennett for having joined Martin in filing discrimination charges against CleanNet at the EEOC.

54. Other former employees of CleanNet have conducted business in the cleaning contract industry within the vicinity of CleanNet offices or, in conducting such other business, have used certain information that they had obtained through their employment at CleanNet.

55. None of these other former employees has filed employment discrimination charges at the EEOC against CleanNet.

56. Neither CleanNet nor CleanNet Baltimore/Washington has sued any of these other former employees for claims arising out of business dealings that they had engaged in after leaving CleanNet.

57. As a direct and proximate result of the acts of the Defendants, their agents, and employees, the Plaintiffs have suffered and continue to suffer injury, including the loss of employment and past and future loss of income and other employment benefits, as well as emotional distress, pain and suffering, and harm to their professional reputations.

### COUNT I - DISCRIMINATORY TREATMENT IN VIOLATION OF TITLE VII AND SECTION 1981

58. Paragraphs 1 through 57 are incorporated herein by reference and realleged.

59. The Defendants discriminated against Plaintiff Martin in violation of Title VII, 42 U.S.C. § 2000e-2, and Section 1981, 42 U.S.C. § 1981, by treating him less favorably in the terms and conditions of his employment on the basis of race, specifically with respect to his job title and compensation.

60. The Defendants engaged in these discriminatory practices with malice or with reckless indifference to the Plaintiff's federally protected rights.

61.     Pursuant to Title VII, 42 U.S.C. § 2000e-5, and Section 1981, 42 U.S.C. §§ 1981 and 1981a, Plaintiff Martin is entitled to judgment awarding him appropriate relief.

### COUNT II - DISCRIMINATORY TREATMENT IN VIOLATION OF TITLE VII

62.     Paragraphs 1 through 57 are incorporated herein by reference and realleged.

63.     Defendant CleanNet discriminated against Plaintiff Andrews in violation of Title VII, 42 U.S.C. § 2000e-2, by treating her less favorably in the terms and conditions of her employment on the basis of sex, such as with respect to her compensation.

64.     Defendant CleanNet engaged in these discriminatory practices with malice or with reckless indifference to the Plaintiff's federally protected rights.

65.     Pursuant to Title VII, 42 U.S.C. § 2000e-5, Plaintiff Andrews is entitled to judgment awarding her appropriate relief.

### COUNT III - VIOLATION OF THE EQUAL PAY ACT

66.     Paragraphs 1 through 57 are incorporated herein by reference and realleged.

67.     Defendant CleanNet discriminated against Plaintiff Andrews in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), by paying her at a rate less than the rate at which it paid male employees for equal work.

68.     Defendant CleanNet willfully engaged in these discriminatory practices.

69.     Pursuant to the Equal Pay Act of 1963, 29 U.S.C. § 216, Plaintiff Andrews is entitled to judgment awarding her appropriate relief.

### COUNT IV - HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII AND SECTION 1981

70.     Paragraphs 1 through 57 are incorporated herein by reference and realleged.

71.     Salek and others deliberately engaged in conduct at CleanNet that was unwelcome and harassing on the basis of characteristics such as race and sex.  This conduct was

so severe or pervasive as to affect materially the terms and conditions of the Plaintiffs' employment and create an abusive working environment.

72. The hostile work environment at CleanNet was so racially and ethnically abusive that it compelled Plaintiffs Andrews and Bennett to resign.

73. The Defendants engaged in these discriminatory practices with malice or with reckless indifference to the Plaintiffs' federally protected rights.

74. Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, and Section 1981, 42 U.S.C. §§ 1981 and 1981a, Plaintiffs Andrews, Bennett, and Martin are entitled to judgment awarding them appropriate relief.

## COUNT V - RETALIATION IN VIOLATION OF TITLE VII AND SECTION 1981

75. Paragraphs 1 through 57 are incorporated herein by reference and realleged.

76. Plaintiff Martin was terminated because he had refused to participate in the Defendants' racially discriminatory firing of the four new hires and expressed his opposition to the Defendants' unlawful employment practices.

77. Defendants CleanNet and CleanNet Baltimore/Washington filed a lawsuit against Plaintiffs Andrews and Bennett because they had protested and opposed the Defendants' unlawful employment practices, which included discriminatory treatment and hostile work environment, and filed EEOC charges concerning those practices.

78. The Defendants violated Title VII, 42 U.S.C. § 2000e-3, and Section 1981, 42 U.S.C. § 1981, when they retaliated against Plaintiffs Martin, Andrews, and Bennett for having engaged in activities that are protected under Title VII.

79. The Defendants engaged in these unlawful acts with malice or with reckless indifference to the Plaintiffs' federally protected rights.

80.     Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, and Section 1981, 42 U.S.C. §§ 1981 and 1981a, Plaintiffs Martin, Andrews and Bennett are entitled to judgment awarding them appropriate relief.

### REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court enter judgment against the Defendants and award the following relief:

a.     Damages in the amount of at least $10,000,000, including back pay and front pay comprising salary, commissions, and other benefits, as well as interest on such sums, liquidated damages, compensatory damages, and punitive damages pursuant to 42 U.S.C. § 2000e-5, 29 U.S.C. § 216, and 42 U.S.C. §§ 1981 and 1981a;

b.     An injunction enjoining the Defendants from further engaging in unlawful employment practices, and requiring the Defendants to adopt and implement policies and procedures that are designed to eliminate their hostile work environment and discriminatory employment practices;

c.     Reasonable attorneys' fees and costs of this action, pursuant to 42 U.S.C. § 2000e-5(k), 29 U.S.C. § 216(b), and 42 U.S.C. § 1988(b); and

d.     Such further relief that this Court deems just and proper.

### REQUEST FOR JURY TRIAL

The Plaintiffs, by their undersigned counsel, respectfully request a jury trial.

Respectfully submitted,

*[signature]*

Thomas S. Williamson, Jr. (bar no. 07695)
Reenah L. Kim
COVINGTON & BURLING
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2401
Phone: (202) 662-6000
Fax:    (202) 662-6291

Attorneys for Plaintiff

Dated: October 21, 2003